**Entered on Docket**
**October 17, 2007**

_Bruce A. Markell_
_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                    )
                                          )    Case No. : BK-S-03-19478-BAM
FLAMINGO 55, INC.,                        )    Chapter 7
                                          )    Involuntary Case
                Debtor.                   )
                                          )
_- Consolidated with -_                   )    ---------------------------------------------------
                                          )    Case No. : BK-S-03-25222-BAM
In re:                                    )    Chapter 7 (converted)
                                          )
VEGAS TOWNHOME PARTNERS, L.P.,            )
                                          )    Date:        January 18, 2007
                Debtors.                  )    Time:        9:30 a.m.
_____ )

**OPINION ON TRUSTEE'S AND EMERALD GATE'S OBJECTION TO
SUBROGATION CLAIM**

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## Table of Contents

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

II.   FACTS — "OVER, UNDER, SIDEWAYS, DOWN" . . . . . . . . . . . . . . . . . . . . . . . . **1**

III.  GRANTHAM'S AND SABA'S STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

IV.   SUBROGATION UNDER NONBANKRUPTCY LAW . . . . . . . . . . . . . . . . . . . . . . **7**
  *A.*  *What Law Applies?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
  *B.*  *Subrogation Elements Under California Civil Code* . . . . . . . . . . . . . . . . . . . . *8*
      1.  Subrogation and California Civil Code §§ 2787 and 2848-49 . . . . . 8
      2.  Subrogation and California Civil Code §§ 2903 and 2904 . . . . . . . . . . . . . . . . . . . 9
  *C.*  *Subrogation Under Article 3 of the Uniform Commercial Code* . . . . . . . . . . . . *10*
      1.  Co-Maker Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      2.  Accommodation Party Status . . . . . . . . . . . . . . . . . . . . . . . . . 11
  *D.*  *Subrogation Under California Common Law* . . . . . . . . . . . . . . . . . . . . . . . . *12*
      1.  Payment Made, and Made to Protect Subrogee/Payor's Own Interest . . . . . . . . . . . . 13
          a.  **Payment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
          b.  **Made to Protect Subrogee's Own Interest** . . . . . . . . . . . . . . . . . . . . . . **14**
      2.  Subrogee Not Acting As a Volunteer . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      3.  Subrogee Not Primarily Liable on the Debt Paid . . . . . . . . . . . . . . . . . . . 14
      4.  Subrogee Paid the Entire Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      5.  Subrogation Would Not Work An Injustice to the Rights of Others or Subrogee Has "Superior Equities" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          a.  **The Relative Fault of the Person Seeking Subrogation** . . . . . . . . . . . . . . **16**
          b.  **The Effect of Imposing Subrogation on Other Parties** . . . . . . . . . . . . . . **19**
      6.  Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    SUBROGATION UNDER 11 U.S.C. § 509(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
  *A.*  *Relation to Nonstatutory Common Law and to the U.C.C.* . . . . . . . . . . . . . . . . . . . . *20*
  *B.*  *Basic Requirements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *20*
      1.  "Entity that . . . has secured . . . a claim of a creditor against a debtor . . ." . . . . . . . . 21
      2.  "Subrogated to the rights of such creditor to the extent of such payment" . . . . . . . . . 21
      3.  Exception — 11 U.S.C. § 509(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

## I.  INTRODUCTION

Gregory Grantham and John Saba are two California attorneys who also jointly invest in businesses and real estate.  After foreclosure of a California property in which they had an interest, they filed a claim in this bankruptcy.[1]  That claim asserts that Nevada property owned the debtor, Flamingo 55, Inc. ("Flamingo 55"), also secured the claim satisfied by the California foreclosure.  Accordingly, Grantham and Saba claim they are now subrogated to the foreclosing entity's claim against Flamingo 55.

Timothy Cory, the chapter 7 trustee ("Trustee"), and Emerald Gate Construction, Inc. ("Emerald Gate"), each objects to the claim on myriad grounds.  After a review of the lengthy and convoluted record, this court sustains the Trustee's and Emerald Gate's objections, and disallows Grantham and Saba's claim.

## II.  FACTS — "OVER, UNDER, SIDEWAYS, DOWN"[2]

Grantham and Saba's claim originated with a failed limited liability company,  Broadway-Acacia, LLC ("BA").  BA was organized in 1997.  Its members were Grantham, Saba, Mervyn Phelan, Sr., Mervyn Phelan, Jr., and Craig Brown.  Each member was to have a 20% interest, even though Grantham and Saba contributed 60% of the enterprise's funds.  Case No. 03-19478, Docket No. 84, Memorandum of Points and Authorities p. 2 (May 28, 2004).

In late 1997, BA purchased property at 410 Broadway in Laguna Beach, California ("California Property") from the Resolution Trust Company for $500,000.  BA later invested another $100,000 for renovations and improvements.  This was a good investment; indications are that by 2001 the California Property's value had increased to almost $1.8 million due to the improvements and other work.  Further, indications in the record show that BA may have refinanced the property and used a portion of the refinancing proceeds to invest in other real estate.  *Id.*

All would have been well but for the fact that Grantham and Saba had thrown their lot in with crooks.  In May 2001, Brown, Phelan, Sr., and Phelan, Jr., caused BA to encumber its real estate.  The purpose of this encumbrance was to allow another entity controlled by the Phelans

---

[1]Originally, Grantham and Saba filed their claim on November 19, 2005, and it was assigned Claim Number 9.  They amended the claim on July 3, 2006, and the amendment was assigned Claim Number 10.  In this opinion, the reference to Grantham's and Saba's claim or claims are to the original claim as amended.

[2]THE YARDBIRDS, *Over, Under, Sideways, Down, on* ROGER THE ENGINEER (Warner Bros. 1966).  As the facts show, Grantham and Saba have tried almost every legal stratagem to gain access to the value represented by Flamingo 55's Nevada property.  They have come in over Flamingo 55, claiming  Flamingo 55's property was liable for debts owed by Flamingo 55's initial parent entity.  They have come in under Flamingo 55 by asserting ownership, through an affiliated entity, of 100% of Flamingo 55's equity.  The claims at issue here represent an effort to squeeze in sideways as a secured claim against Flamingo 55's assets.  This effort, as will be seen, is destined to be turned down.  All that is left is the song's refrain, "When will it end?"

and Brown to acquire land in Nevada.  That entity, then known as Senior Care Homes, Inc.,[3] formed a wholly-owned subsidiary to take title to the Nevada property.  That subsidiary is the debtor in this case, Flamingo 55.  Acting through Senior Care, the Phelans and others caused Flamingo 55 to acquire 54 unimproved lots in Las Vegas, Nevada (the "Nevada Property").[4]  Five hundred thousand dollars of the downpayment for the acquisition came from a $675,000 loan made by Datacom, Inc. ("Datacom").  Both BA and Flamingo 55 signed the note representing the loan.  Datacom secured the note with a first deed of trust on the Nevada Property, and a second deed of trust on the California Property.  The seller of the Nevada Property, an entity currently known as Emerald Gate, received cash and notes as consideration for the conveyance of the Nevada Property to Flamingo 55.[5]

All of the relevant parties also signed a "Cross-Collaterization Agreement" under which they all agreed that Datacom could look to any of its security in any order in case of a default.  This included Phelan Jr. and Brown, BA's managing members. This document is additionally significant because it does not establish any particular priority in terms of payment, and does not use words of guaranty or any form of secondary liability to describe BA's role.  After some delays, the transaction closed, with Flamingo 55 taking title to the Nevada Property.

Grantham and Saba allege that they did not learn of the Flamingo 55 transaction until after it occurred.  They then reassessed their relationship with the Phelans and Brown and began various legal actions to attempt to unwind the deal.

One of the first successes in their campaign was a $4.5 million default judgment against Senior Care obtained on September 6, 2002.  (Case No. 01CC10469, Orange County) ("Default Judgment").  Pursuant to the Default Judgment: "Broadway-Acacia, LLC"[6] was recognized as a failed, de facto, Delaware limited liability company, and was held to be a general partnership; as so characterized, BA was dissolved; Saba was designated partner in charge of wrapping up BA's affairs; and Grantham and Saba were awarded the California Property.

Grantham and Saba then attempted to domesticate the Default Judgment in Nevada.  In October 2002, even though Flamingo 55 was not a party to the Default Judgment, Grantham and Saba applied for a Nevada judgment based upon the Default Judgment.  In an effort to evade this action, Phelan, Sr. caused Flamingo 55 to transfer the Nevada Property to Vegas Townhome Partners, L.P. ("VTP") on November 12, 2002.  Senior Care, by then known as Investco, also executed a stock power for the general partner of VTP, Vegas Townhome Partners Management, Inc., in favor of Richfield Financial, LLC, an affiliate of Phelan and his cronies.  Case No. 03-19478, Docket No. 84, Memorandum of Points and Authorities pp. 4-5 (May 28, 2004).

In May 2003, Grantham and Saba sued Flamingo 55, VTP, Senior Care and others alleging that the transfer to VTP was fraudulent as to them.  In this lawsuit, Grantham and Saba took the

---

[3]Senior Care was a publicly-traded company controlled by the Phelans and others.  It had previously been know as U.S. West Homes, and later was known as Investco, Inc.  This opinion will refer to it generally as Senior Care, since that was its name at the time of the loan to BA and Flamingo 55.

[4]It is a long and irrelevant story, but 55 lots should have been conveyed.

[5]Emerald Gate's claim has been subject to partial disallowance by this court.

[6]Reference to "Broadway-Acacia, LLC" is to the same entity as BA.

position that they were creditors of Flamingo 55 as a result of the Default Judgment, and that, through the doctrine of reverse veil-piercing, the Nevada Property (after avoidance of the fraudulent transfer to VTP) should be encumbered to secure the debts owing under the Default Judgment.

For reasons that are not in the record, VTP transferred the Nevada Property to R.H. Construction and Red Rock Asset Trust on July 1, 2003; these latter two entities were controlled by Grantham and Saba.  An involuntary chapter 7 bankruptcy case was then begun against Flamingo 55 on July 21, 2003; the court entered an order for relief on January 15, 2004. VTP commenced a voluntary chapter 11 case on December 12, 2003; this case was converted to a case under chapter 7 on March 18, 2004.  Ultimately, both cases were substantively consolidated on May 12, 2004, and the Trustee was confirmed as the chapter 7 trustee for the consolidated case.

The Trustee soon filed a fraudulent transfer action against, among others, Grantham and Saba seeking to avoid the July 1, 2003 transfer of the Nevada Property to the Grantham and Saba-controlled entities. (Adv. Pro. 04-1168).  In July 2004, that lawsuit was settled by the reconveyance of the Nevada Property to Flamingo 55.[7] Case No. 04-1168, docket No. 16, Settlement Stipulation p. 3-4 (May 6, 2005).

In the midst of this litigation, Grantham and Saba filed a proof of claim in the Flamingo 55 estate based on their attempt to record the Default Judgment in Nevada.  This proof of claim asserted reverse veil-piercing.  In essence, Grantham and Saba alleged that Senior Care's subsidiary, Flamingo 55, was liable for the debts of its parent.  Saba Proof of Claim, filed May 7, 2005.  This court has disallowed that claim.[8] Case No. 03-19478, Docket No. 233 (Nov. 16, 2004).

Meanwhile, Grantham and Saba were still pursuing litigation in California regarding the scams perpetrated against them.  In a separate action, captioned "Grantham and Saba v. Investco (and others)," Case No. 03CC00248 (Orange County), the parties reached a settlement under which another entity controlled by Grantham and Saba, Acorn Development, Inc. ("Acorn"), received all of Investco's stock in Flamingo 55, and all of Investco's interests in VTP (the

---

[7]Before reaching the settlement, however, Saba and Grantham had answered the Trustee's complaint, and had averred that the consideration for the transfer was "(1) the assumption of liabilities secured by liens against the property in the amount of approximately $900,000 - $1,000,000; (2) a partial satisfaction of the judgment in the amount of $250,000, [on the Orange County judgment 01CC10469]; and (3) an agreement to provide an acknowledgment of satisfaction of judgment in an amount equal to the profits realized by Saba and Grantham from development of the subject property." Para. 6 of Answer Adv. Pro. No. 04-1168, Docket No. 12, p. 3 (July 29, 2004).

[8]This court's order was sustained on appeal to the district court, and the Ninth Circuit Court of Appeals has affirmed the district court's order.

"Investco Settlement").[9]  The transfer thereby effected was stated to be in lieu of Grantham and Saba enforcing the rights they obtained under the Default Judgment.  Investco Settlement at p. 8.

Soon after the Investco Settlement was effectuated, Grantham and Saba attempted to amend the statements and schedules in Flamingo 55's case to reflect their new ownership of the equity interests in Flamingo 55.  Case No. 03-19478, Docket No. 302 (Dec. 20, 2004), Case No. 03-19478, Docket No. 395 (March 4, 2005).  Initially, Grantham and Saba attempted to amend Flamingo 55's Schedule D to list their "lien" as described in their proof of claim based on the domestication in Nevada of the Default Judgment.  The court struck this amendment on May 13, 2005 as filed in bad faith; that order was not appealed.  Case No. 03-19478, Docket No. 494 (May 13, 2005).

Next, Grantham and Saba attempted to amend Flamingo 55's Schedule A to change the debtor's ownership of the property.  Case No. 03-19478, Docket No. 394 (March 4, 2005). The court struck this effort on May 13, 2005 as well.

Finally, Grantham and Saba filed a list of equity security holders for Flamingo 55 listing Acorn as the sole equity holder.  Case No. 03-19478, Docket No. 429 (Apr. 11, 2005).  This was also struck as no statement of equity holders is required or permitted in chapter 7.  Case No. 03-19478, Docket No. 677 (Nov. 8, 2005)

Grantham and Saba's efforts did not stop there.  They also attempted to convert Flamingo 55's case to one under chapter 11, or to have it dismissed. Their first motion to this effect was filed on February 1, 2005, Case No. 03-19478, Docket No. 369 (Feb. 1, 2005), but they withdrew it on February 18, 2005.  Case No. 03-19478, Docket No. 386 (Feb. 18, 2005).  Their second motion was filed on April 15, 2005, Case No. 03-19478, Docket No. 436 (Apr. 15, 2005), and denied by the court after hearing on May 17, 2005.  Case No. 03-19478, Docket No. 516 (May 31, 2005).

During this time, Grantham and Saba filed a separate adversary proceeding, No. 05-1020 (February 1, 2005), seeking to quiet title to the Nevada Property in themselves (the "Quiet Title Action").  Ultimately, on summary judgment, the Trustee obtained a judgment that the estate owned the Nevada Property land free and clear of any constructive trust claims of Grantham and Saba.  Case No. 05-1020, Docket No. 32 at p. 2.  The judgment in the Quiet Title Action was not appealed, and is now final.

Datacom, the holder of the $675,000 note secured by both the California Property and the Nevada Property, had not been idle during this time.  It duly filed a proof of claim in Flamingo 55's bankruptcy, and sought relief from stay to foreclose upon the Nevada Property.  That request

---

[9]The settlement, confirmed in Paragraph 1.b.iv. of the California state court order approving the settlement, states:

Investco, fka U.S. West Homes, fka Senior Care, hereby grants, conveys, assigns, remises and transfers to Acorn Development, Inc., a Nevada corporation [a corporation controlled by Grantham and Saba] all of the issued and outstanding common stock of Flamingo 55, Inc., a Nevada corporation, and Vegas Townhome Partners Management, Inc., a Nevada corporation, and all of the partnership interest in Vegas Townhome Partners, L.P.  The aforesaid transfers of all legal and beneficial ownership of said entities is free and clear of any claim or right, title or interest of the defendants and in lieu of enforcement of Plaintiffs' judgment in Case No. 01CC10469 by Writ of Execution and sale.

was denied, without prejudice, and Datacom was directed to exercise whatever remedies it had against the California Property first.  Case No. 03-19478, Docket No. 65 (Apr. 21, 2004).

After a long series of skirmishes, Datacom foreclosed on the California Property on March 4, 2005.  It thereafter withdrew its proof of claim in this bankruptcy on March 10, 2005, Case No. 03-19478, Docket No. 397 (Mar. 10, 2005), and reconveyed its deed of trust on the Nevada Property on June 1, 2005.  Case No. 03-19478, Docket No. 507 (May 25, 2005).  There were sufficient proceeds from the foreclosure on the California Property to satisfy Datacom's claim, and to return a significant amount of cash to Grantham and Saba, who were entitled to such funds as the successors in interest to BA.

On November 19, 2005, Grantham and Saba filed a claim based upon subrogation in the Flamingo 55 case, which they amended on July 3, 2006.  It is that claim to which the Trustee objects.[10]

In addition to battling Grantham and Saba, the Trustee managed to sell the Nevada Property.  Case No. 03-19478, Docket No. 580 (July 12, 2005).  The Trustee retains the proceeds from that sale which, after various interim distributions on administrative claims, aggregate to more than a million dollars.  The objection to the subrogation claim is the last, and the determinative, claims objection.  If allowed, Grantham and Saba will have a secured claim of some $982,740; if disallowed, their distributions will be through Acorn, and will be paid after administrative claims, and the claims of Emerald Gate, which aggregate to approximately $900,000.  Before deciding this claim, however, a review of the exact status of Grantham's and Saba's claim is appropriate.

## III.  GRANTHAM'S AND SABA'S STANDING

Grantham and Saba contend that they should be subrogated to Datacom's position following Datacom's foreclosure on BA's property.  After all, they argue, they did not benefit from the lien placed upon BA's property; indeed, they contend that the lien was placed on the property without their knowledge or their consent.  Case No. 03-19478, Docket No. 84 Memorandum of Points and Authorities at pp. 2-3 (May 28, 2004).

But this view eludes critical distinctions, and is based upon positions contrary to those that they have taken in this and in other litigation.  In this litigation, Grantham and Saba represent BA, not themselves.  Saba Proof of Claim, filed July 3, 2006.  One consequence of this fact is that the equities of the case must be viewed from BA's perspective.  That such a perspective is different than that of Grantham and Saba is apparent from the litigation among BA's former partners, and from Grantham and Saba's dogged pursuit of judgment creditor remedies against Senior Care in all its various incarnations.

This shift in perspective dooms the subrogation claim.  The facts show that BA was essentially a co-partner or co-venturer with Phelan-controlled entities in the acquisition of Flamingo 55's land.  *See* CAL. CORP. CODE § 16202(a) ("the association of two or more persons

---

[10]The Trustee previously moved to make interim distributions to unsecured creditors, which Grantham and Saba opposed based on their subrogation claim.  This court held that such claims were encompassed in the Quiet Title Action, and thus were barred by the doctrine of claim preclusion.  On appeal, the district court held that since the foreclosure of the California Property had not occurred at the time of the filing of the Quiet Title Action, the subrogation claims had not accrued at that time, and thus could not have been merged into any judgment in that adversary proceeding.  It accordingly reversed this court's order permitting the interim distribution.

to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership."). This fact should not be completely surprising given that, at all relevant times, BA was controlled by Phelan, Sr. and his cohort. Case No. 03-19478, Docket No. 84, Memorandum of Points and Authorities at pp. 2-3 (May 28, 2004). Grantham and Saba have exploited and benefitted from this status. Under the Default Judgment and the Investco Settlement, they obtained all of the equity interests in BA and in Flamingo 55. Fatal to the relief requested, however, is that BA (albeit BA controlled by Phelan and others holding 60% of its equity interests) was a voluntary co-participant in the acquisition by Flamingo 55 of the Nevada Property.

Initially, the proof of claim filed by Grantham and Saba concedes that "Flamingo 55, Inc. was a co-maker and co-debtor, together with Broadway-Acacia, LLC, of the $675,000 note to Datacom . . . ." Saba Proof of Claim, filed July 3, 2006, Exhibit 5. In addition, the deed of trust encumbering the Nevada Property listed BA's address as its own. More telling, however, is that BA, Flamingo 55, Phelan, Sr., Phelan, Jr., Brown, Bob Coberly and John Cruikshank were all collectively referred to as one entity (the "Second Party") in a "Cross Collateral Agreement" with Datacom, which was entered into simultaneously with BA's note to Datacom. That agreement provided that Datacom could pursue any of the members of the "Second Party," or any combination of them or their properties, in the event of a default. Saba Proof of Claim, filed July 3, 2006, Exhibit 6. In short, BA was a co-maker on the note given to Datacom, and no document in the record indicates that BA was anything other than a principal.[11] True, the ability of BA and the other participants of the "Second Party" to recover any profits from Flamingo 55's real estate activities would have been convoluted – entailing a distribution from Flamingo 55 to Senior Care and from Senior Care to BA[12] – but that would not have prevented BA from authorizing the encumbrance of its property in pursuit of the scheme. Indeed, given the incredibly broad definition of a general partnership quoted above, it is easily seen that BA and Senior Care were effectively copartners or coventurers in the development of the Nevada Property.[13] This conclusion is buttressed by the fact that Grantham and Saba have impliedly followed a course based upon this characterization; the pursuit of their feckless and faithless partners put them in the shoes of BA, of the equity holders of Flamingo 55, and thus in the shoes of any joint venture or partnership between these entities.[14]

The perspective shift also frames the wrong done here – because there was a wrong committed – as a wrong by certain equity investors of BA against other equity investors of BA.

---

[11]Were the intent that BA was to be secondarily liable for the Datacom loan, one might have expected to find a document in the record, at least between BA and Flamingo 55, evidencing this fact. None appears. Alternatively, since Datacom had requested far more collateral than the amount of the debt, BA could have placed a junior deed of trust on the Nevada Property to secure Flamingo's obligation to indemnify BA, or to secure BA's contribution claims against Flamingo 55. No such documents appear or are even mentioned in the record.

[12]There is also the possibility that there was some agreement among those denominated as the "Second Party" as to how to distribute profits and proceeds, but the record is devoid of any evidence of such an agreement.

[13]There is some hint in the record that BA used the California Property to fund or facilitate other real estate projects through the refinancing of the property and use of the proceeds.

[14]Another fact against characterizing BA's liability as secondary is that the documentation produced was essentially public; the deed of trust on the Nevada Property, for example, lists BA's California address as its own.

And Grantham and Saba have pursued these grievances diligently and comprehensively in California's courts, as represented by the Default Judgment and the Investco Settlement.

But subrogation in this case is about more than the rights and liabilities among BA's former partners. Flamingo 55 had, and has, other creditors not chargeable with the deceits practiced upon Grantham and Saba, and the Trustee has pursued diligently the prompt administration of this estate. These parties would be adversely affected by reinstating the Datacom lien, and thus any analysis of the claims of subrogation has to account for the effect on the other creditors.

Against this background, the court reviews the claims of subrogation that BA might have, and finds that there are many: subrogation under nonbankruptcy common law, under nonbankruptcy statutory law, and under the Bankruptcy Code itself. Unfortunately for Grantham and Saba, none of these claims can sustain the relief they seek.

## IV.   SUBROGATION UNDER NONBANKRUPTCY LAW

"[S]ubrogation is the substitution of one party in place of another with reference to a lawful claim, demand or right. . . . Subrogation places the party paying the loss or claim (the 'subrogee') in the shoes of the person who suffered the loss ('the subrogor'). Thus, when the doctrine of subrogation applies, the subrogee succeeds to the legal rights and claims of the subrogor with respect to the loss or claim." Hamada v. Far East Nat'l Bank (*In re* Hamada), 291 F.3d 645, 649 (9th Cir. 2002). *See also* Han v. United States, 944 F.2d 526, 529 (9th Cir. 1991); Milgard Tempering, Inc. v. Darosa (*In re* Darosa), 318 B.R. 871, 877 (B.A.P. 9th Cir. 2004).[15]

In short, subrogation is essentially an equitable assignment of a claim, made without regard to whether the claim assigned has actually been discharged at law. It "does not spring from contract although it may be confirmed or qualified by contract. . . .[I]t is a rule that the law adopts to compel the eventual satisfaction of an obligation by the one who ought to pay it." RESTATEMENT (THIRD) OF SURETYSHIP AND GUAR. § 27, cmt. a (1996).

Subrogation has a long history. *See* M.L. Marasinghe, *An Historical Introduction to the Doctrine of Subrogation: The Early History of the Doctrine I & II*, 10 VAL. U. L. REV. 45 & 275 (1976). *See also* Celotex Corp. v. Allstate Ins. Co. (*In re* Celotex Corp.), 289 B.R. 460, 467 (Bankr. M.D. Fla. 2003) (citing the 1905 edition of POMEROY'S EQUITY JURISPRUDENCE). But as with any venerable

---

[15]There are different "flavors" of subrogation, each with somewhat different qualities. The Ninth Circuit has categorized these types as "conventional" or "contractual" subrogation, "legal" or "equitable" subrogation, and statutory subrogation.

"Conventional" or "contractual" subrogation rights arise from an express or implied agreement between the subrogor and the subrogee. Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank, 265 F.3d 601, 626 (7th Cir. 2001). "Equitable subrogation is a legal fiction, which permits a party who satisfies another's obligation to recover from the party 'primarily liable' for the extinguished obligation." In re Air Crash Disaster, 86 F.3d 498, 549 (6th Cir. 1996). The right of "legal" or "equitable" subrogation arose as a "creature of equity" and "is enforced solely for the purpose of accomplishing the ends of substantial justice." Memphis & L.R.R. Co. v. Dow, 120 U.S. 287, 302 (1887). Statutory subrogation, as one might expect, occurs by virtue of a right created by statute. *See, e.g.*, Carter v. Derwinski, 987 F.2d 611, 614 (9th Cir.1993) (en banc).

*Hamada*, 291 F.3d at 649.

equitable doctrine, it is to be flexibly applied. It is "a legal fiction and because it is a creature of equity it 'is enforced solely for the purpose of accomplishing the ends of substantial justice.'" Taxel v. Chase Manhattan Bank, USA, N.A. (*In re* Deuel), 361 B.R. 509, 517 (B.A.P. 9th. Cir. 2006) (quoting *Hamada*, 291 F.3d at 649). As a consequence, the application of the legal principles involved must be undertaken with an eye to the relative equities. And it is to those equities that this opinion now turns.

### A.    *What Law Applies?*

The initial question, however, is what law applies here? Candidates include California statutory law, in the form of its Civil Code and its Commercial Code, and general rules of equity as established by California decisional law.[16] An examination of these candidates shows that California's rich decisional law will ultimately answer most, if not all, of the questions raised by Grantham's and Saba's proof of claim.

### B.    *Subrogation Elements Under California Civil Code*

The California Civil Code has two sets of statutes potentially applicable to this proceeding. First are those provisions which apply to guarantors and sureties; next are those related to those who pay liens on real property in which the payor has an interest. Each is reviewed below.

### 1.    Subrogation and California Civil Code §§ 2787 and 2848-49

As originally filed, Grantham and Saba cited Sections 2787 and 2848-49 of California's Civil Code as authority for their right to subrogate to Datacom's claim. The most pertinent of these sections states that a surety or guarantor, "upon satisfying the obligation of the principal, is entitled to enforce every remedy which the creditor then has against the principal to the extent of reimbursing what he has expended . . . ." CAL. CIVIL CODE § 2848.[17]

Grantham and Saba contend that they fit this definition. They argue that the foreclosure sale of the California Property "satisfied the obligation of the principal," and thus they are now

---

[16]The Trustee has not contested Grantham and Saba's selection of California law as the appropriate law to resolve the subrogation claims, and thus the court will apply California substantive law to the issues raised. Although Nevada law is less developed with respect to subrogation of real property liens, the Nevada Supreme Court recently adopted the view expressed in the RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES as part of its decisional law. Houston v. Bank of Am. Fed. Sav. Bank, 119 Nev. 485, 490 (2003) ("Because the *Restatement* approach is the most persuasive, we adopt the view expressed by it."). While there are differences between the *Restatement* and California decisional law, the facts of this case do not implicate these differences. *See* Matthew Lilly, *Comment, Subrogation of Mortgages in California: A Comparison with the Restatement and Proposals for Change*, 48 U.C.L.A. L. REV. 1633 (2001).

[17]The full text of Section 2848 is as follows:

§ 2848. Enforcement of creditor's remedies against principal; contribution by co-sureties

THE SURETY ACQUIRES THE RIGHT OF THE CREDITOR. A surety, upon satisfying the obligation of the principal, is entitled to enforce every remedy which the creditor then has against the principal to the extent of reimbursing what he has expended, and also to require all his co-sureties to contribute thereto, without regard to the order of time in which they became such.

entitled to "enforce every remedy which the creditor then has against the principal." In parsing this argument, BA is the "creditor" and the "principal" is Flamingo 55. In short, this argument configures the parties so that BA is a guarantor of Flamingo 55's land acquisition debt, and argues from this premise that the satisfaction of Datacom's debt with the foreclosure proceeds of the California Property subrogates BA to Datacom's position against Flamingo 55.[18] The conclusion of this argument is that BA now has a first lien on the Nevada Property despite Datacom's formal reconveyance.

There are several problems with this argument, but the main, and conclusive, objection is that BA was not, and is not, a surety or guarantor, a necessary predicate for the application of Section 2848. Under California law, a surety is the same as a guarantor, and "[a] surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." CAL. CIVIL CODE § 2787.[19] Here, as explained above, the debt was BA's as much as it was Flamingo 55's. Through the intercession of Senior Care (as manipulated by Phelan and his confederates), BA became directly liable to Datacom on the debt with Flamingo 55, and thus did not promise to "answer for the debt, default, or miscarriage of *another*." BA had agreed to make the debt to Datacom its own. The record is devoid of any indication that, at the time BA incurred the obligation, that there was any agreement or understanding that Flamingo 55's obligation was primary, or that Flamingo 55 alone should bear any risk of loss. *See, e.g.*, Mead v. Sanwa Bank Cal., 71 Cal. Rptr. 2d 625, 630-632, 61 Cal. App. 4th 561, 569-572 (4th App. Dist. 1998) (charting history in California of rule that if creditor knew party was acting as surety, then creditor was bound to treat party as surety). As a result, relief under Section 2848 is not available.

### 2.    Subrogation and California Civil Code §§ 2903 and 2904

Grantham and Saba also refer to Sections 2903 and 2904 of California's Civil Code in support of their claims. Section 2903 provides:

§ 2903. Right of redemption; subrogation

Every person, having an interest in property subject to a lien, has a right to redeem it from the lien, at any time after the claim is due, and before his right of redemption is foreclosed, and, by such redemption, becomes subrogated to all the benefits of the lien, as against all owners of other interests in the property, except in so far as he was bound to make such redemption for their benefit.

---

[18]If not apparent by Section 2848, Section 2849 makes this plain for a surety:

§ 2849. Surety entitled to benefits of securities for performance

SURETY ENTITLED TO BENEFIT OF SECURITIES HELD BY CREDITOR. A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor, or by a co-surety at the time of entering into the contract of suretyship, or acquired by him afterwards, whether the surety was aware of the security or not.

[19]This section also states that "[t]he distinction between sureties and guarantors is hereby abolished." CAL. CIVIL CODE § 2787.

9

While clear that BA had an interest in the land as its owner, it is less than clear that this section has any applicability to this case. Section 2903 requires redemption; that is, the payment by the owner to the creditor to clear the creditor's interest from title. It also requires the "right of redemption" to be exercised "before his right of redemption is foreclosed." CAL. CIVIL CODE § 2903.

Here, however, Grantham and Saba, as successors to BA, allowed the California Property to be foreclosed upon. Put another way, Datacom divested BA and its successors from title, and passed title to another at the foreclosure sale. To be sure, the foreclosure produced excess proceeds to which BA, as owner, was entitled. But redemption is fundamentally inconsistent with foreclosure: one action restores title to the owner of the interest; the other evidences loss of such title. Section 2903 explicitly recognizes this relationship when it requires that the redemption that creates subrogation occur "before . . . the right of redemption is foreclosed. CAL. CIVIL CODE § 2903. As a result, without a redemption, Section 2903 cannot apply to these facts.

Section 2904 similarly does not apply. It requires that the person redeeming the property have "a lien inferior to another, upon the same property." CAL. CIVIL CODE § 2904.[20] Here, Grantham and Saba were not lienholders. They were owners. As such, the text of the statute does not apply.

C.    *Subrogation Under Article 3 of the Uniform Commercial Code*

The note given to Datacom had all the hallmarks of a negotiable instrument under Article 3 of California's version of the Uniform Commercial Code. It was made payable to Datacom "or order," and imposed no obligations (other than those permitted by CAL. COMM. CODE § 3106) other than the promise to pay Datacom or order $675,000 plus interest. All other requirements for a document to be an "instrument" under Article 3 were present. As such, it is a negotiable instrument subject to Article 3. CAL. COMM. CODE § 3104(a).

Article 3 recognizes a right of subrogation for parties it labels as "accommodation parties." CAL. COMM. CODE § 3419(e). Upon examination, however, BA (and its successors Grantham and Saba) do not qualify for accommodation party status, and thus they do not have any right of subrogation under Article 3.

**1.    Co-Maker Status**

As an initial matter, BA is listed as a maker on the note to Datacom. As such, it was "obliged to pay the instrument . . . according to its terms at the time it was issued" CAL. COMM. CODE § 3412. Flamingo 55 was also a maker, but that fact is irrelevant to BA's liability to

---

[20]The full text of Section 2904 is as follows:

§ 2904. Rights of inferior lien holder

RIGHTS OF INFERIOR LIENOR. One who has a lien inferior to another, upon the same property, has a right:

1. To redeem the property in the same manner as its owner might, from the superior lien; and,

2. To be subrogated to all the benefits of the superior lien, when necessary for the protection of his interests, upon satisfying the claim secured thereby.

Datacom; BA and Flamingo 55 were jointly and severally liable under the terms of the law and the note. *See* CAL. COMM. CODE § 3116(a).

While makers may be without defenses as to persons entitled to enforce the instrument, their relative status as co-makers does matter in this case. Under California law, a presumption arises that one who signs a promissory note with others is liable thereunder as a co-maker rather than a surety. Holtman v. Ledford, 170 Cal. App. 2d 481, 483, 339 P.2d 150 (Ct. App. 1959). While this would normally preclude subrogation, Article 3 of California's Uniform Commercial Code allows for a different result. If BA signed as an accommodation party as defined, subrogation may be available to Grantham and Saba against Flamingo 55 under CAL. COMM. CODE § 3419(e); UNIF. COMM. CODE § 3-419, cmt. 5. *See also* Caito v. United Cal. Bank, 20 Cal.3d 694, 701, 576 P.2d 466, 469, 144 Cal. Rptr. 751, 754 (1978); CAL. CIVIL CODE § 2832.

### 2.    Accommodation Party Status

Section 3419(a) of California's Commercial Code sets forth the applicable test for whether a party is an accommodation party entitled to subrogation. It states:

> (a)  If an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument, the instrument is signed by the accommodation party "for accommodation."

Thus, the inquiry would be whether BA was "a direct beneficiary of the value given for the instrument." Although seemingly straightforward, "[i]t is plainly hard to say just what constitutes a direct benefit." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 13-9.a, at 491 (5th ed. 2000). The difficulty and angst over the proper interpretation is shown by the fact that the official comments to Section 3-419 specifically attempt to correct perceived errors by courts. *Compare* Comment 1 to UNIF. COMM. CODE § 3-419 *with* Nelson v. Cotham, 268 Ark. 622, 595 S.W.2d 693 (Ct. App. 1980).

California law, however, consistently looks to the real and direct benefits received in the transaction in which the negotiable instrument was issued. In Quality Wash Group V, Ltd. v. Hallak, 50 Cal. App. 4th 1687, 1702, 58 Cal. Rptr. 2d 592, 601-02 (Ct. App. 1996), for example, the court found that when a buyer of a business assumed the obligations under a note issued by its seller, and then later paid that note, it was not an accommodation party. It thus had no recourse against the person originally liable on the note. The court reasoned that the buyer had received the direct benefit of the value given for the note (the use of the business), even though the note was issued long before the assumption. *Id.*

Here, a similar direct benefit to BA is present. Due to the common (although not identical) ownership and control Phelan, Sr. and his coterie had over both BA and Flamingo 55, BA directly benefitted from the pledging of its property in the same way a partner would benefit from pledging personal property for a partnership debt.[21] It received an expectation of any profits from the

---

[21]Such partners may have rights of contribution against one another, but not rights of subrogation. *See, e.g.*, *In re* Massetti, 95 B.R. 360, 366 n.8 (Bankr. E.D. Pa. 1987); *In re* Flick, 75 B.R. 204, 206 (Bankr. S.D. Cal. 1987). The difference is critical here as BA would subrogate to Datacom's secured claim, and its subrogated claim would have priority over Flamingo 55's unsecured creditors. Contribution claims, if available and unless otherwise

development of the Nevada Property. In this regard, and as noted above, Grantham and Saba have adopted this characterization through their pursuit of the Default Judgment and the Investco Settlement. In these proceedings, they sought to preserve BA's expectation of an interest in Flamingo 55 and the Nevada Property. That such interests were in the nature of equity interests in Flamingo 55 or a venture having Flamingo 55 as a member, and that those interests have proved to be essentially worthless, is not germane to the analysis. At the time that BA pledged its property, it and Flamingo 55 were joined as partners, or at least joint venturers. That is sufficient for Section 3419's "direct benefit."

Article 3, however, does not purport to be the exclusive repository of all the rights and remedies of accommodation and accommodated parties. As the Permanent Editorial Board of the Uniform Commercial Code acknowledges,

> [the provisions regarding accommodation parties] will not resolve all possible issues concerning the rights and duties of the surety. In the event that a situation is presented that is not resolved by those sections, the resolution may be provided by the general law of suretyship because, pursuant to § 1-103, that law is applicable unless displaced by provisions of this Act.

PERMANENT EDITORIAL BOARD FOR THE UNIFORM COMMERCIAL CODE, *PEB Commentary No. 11 (Sections 3-116, 3-305, 3-415, 3-419, and 3-605)* (Feb. 10, 1994). For completeness, Grantham's and Saba's claims need to be analyzed under California's common law of subrogation.[22]

D. *Subrogation Under California Common Law*

Under California's decisional law of equitable subrogation,

> One who claims to be equitably subrogated to the rights of a secured creditor must satisfy certain prerequisites. These are: "(1) Payment must have been made by the subrogee to protect his own interest. (2) The subrogee must not have acted as a volunteer. (3) The debt paid must be one for which the subrogee was not primarily liable. (4) The entire debt must have been paid. (5) Subrogation must not work any injustice to the rights of others."

Caito v. United Cal. Bank, 20 Cal.3d 694, 704, 576 P.2d 466, 470, 144 Cal. Rptr. 751, 756 (1978)(quoting Grant v. de Otte, 122 Cal. App. 2d 724, 728, 265 P.2d 952, 955 (1954)). *See also* Morgan Creek Residential v. Kemp,153 Cal. App. 4th 675, 690, 63 Cal. Rptr. 3d 232, 243 (Ct. App. 2007); Am. Contractors Indem. Co. v. Saladino, 115 Cal. App. 4th 1262, 1268, 9 Cal. Rptr. 3d 835, 840 (Ct. App. 2004); Golden Eagle Ins. Co. v. First Nationwide Fin. Corp., 26 Cal. App. 4th 160, 169, 31 Cal. Rptr. 2d 815, 821 (Ct. App. 1994) .

As will be shown, Grantham's and Saba's claims also fail this analysis.

_____

secured, would rank equally with unsecured creditors.

[22]With respect to California's statutes on subrogation discussed above, California courts have long held that such statutes do not preempt the common law of suretyship. In Estate of Elizalde, 182 Cal. 427, 188 P. 560 (1920), the California Supreme Court held that the code provisions on suretyship were not intended to state all of the law on the subject; and that where the code is silent, the common law governs. *Id.* at 433, 188 P. at 562. *See also* Filippi v. McMartin,188 Cal. App. 2d 135, 139-40, 10 Cal. Rptr. 180, 183 (Ct. App. 1961).

**1.    Payment Made, and Made to Protect Subrogee/Payor's Own Interest**

The first element of subrogation requires that "[p]ayment must have been made by the subrogee to protect his own interest." *Caito*, 20 Cal. 3d at 704, 576 P.2d at 470, 144 Cal. Rptr. at 756 (quoting *Grant*, 122 Cal. App. 2d at 728, 265 P.2d at 955). In analyzing whether this first element of subrogation has been met, the parties have focused on two aspects: first, whether BA's allowing the property to go to foreclosure was a "payment . . . made *by the subrogee*" within the meaning of *Caito* and equitable subrogation law generally; and second, whether any such payment was made "to protect [BA's] own interest."

### a.    Payment

The Trustee contends that no payment "by the subrogee" was made. Instead, the Trustee argues that all that Grantham and Saba did, as successors to BA, was to suffer the foreclosure of the California Property. As a result, any payment made to Datacom to extinguish its debt was thus made by the buyer at the foreclosure, not by Grantham and Saba.

Neither party could find any case on point. The Trustee's position has the virtue of cold logic; if the requirement is, as *Caito* states, that the payment have been made "by the subrogee," then subrogation cannot be found as the proposed subrogees made no payment. On the other hand, Grantham and Saba clearly suffered a change in circumstances due to the foreclosure: whereas before they had land and a debt; they now have cash and no debt, much as if, they contend, they had sold the California Property and directly paid Datacom. As *Caito* noted, given the equitable origins of subrogation, sometimes equitable concerns can override the stated elements of the judge-made doctrine. *Caito*, 20 Cal. 3d at 705, 576 P.2d at 472, 144 Cal. Rptr. at 757. *See also Han*, 944 F.2d at 529 ("Equitable subrogation is a broad equitable remedy, not limited to circumstances where these five factors are met, but is appropriate whenever 'one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.'").

On balance, however, the Trustee's arguments prevail. As the facts indicate, BA originally entered into the transaction for the Nevada Property with expectations of profiting from its development. Its pledge of the California Property for the deferred purchase money price of Flamingo 55's acquisition was in the nature of a capital contribution to the joint venture among the Phelans, Senior Care, and Flamingo 55. Allowing the foreclosure to count as a "payment" under subrogation law would essentially reverse the capital contribution years after BA (and derivatively, Grantham and Saba) received credit for it. Put another way, BA bargained for an interest in the equity of Flamingo 55, not for an interest in the Nevada Property.[23] Thus, there was no payment by BA (or by Grantham and Saba) upon foreclosure of the California Property, and it (and Grantham and Saba) cannot subrogate to Datacom's position.

---

[23]The Phelans, BA, and others had the power to grant to BA a lien on Nevada Property; they could have secured Flamingo 55's obligation to reimburse BA (if such an obligation ever existed, a fact this court does not find) with a subordinate deed of trust on Nevada Property. That the parties did not prepare any security documents granting BA a security interest or mortgage in Nevada Property is strong evidence – given the documentation that is in the record – that the parties did not intend to create any such legal relationships.

### b.    *Made to Protect Subrogee's Own Interest*

If Grantham and Saba did "pay" Datacom, then they would meet the other sub-element: that they made the payment to protect their own interest.  Under California law, a payment is made to protect one's own interest if the  proposed subrogee is liable on the debt paid or if payment would further the proposed subrogee's legitimate interests.  In *Caito*, for example, the California Supreme Court held that payment by one cotenant of a deed of trust encumbering the entire property did not lead to subrogation – the facts did not rebut the presumption that a cotenant is liable in full for the entire debt on a property despite owning only a fractional interest.  *Caito*, 20 Cal. 3d at 705, 576 P.2d at 472, 144 Cal. Rptr. at 757**.**

Here, BA did execute the note in favor of Datacom.  The satisfaction of that note with the foreclosure proceeds did, therefore, protect its interest in that it reduced BA's (and by extension, Grantham's and Saba's) debt.  California law recognizes that a payment that reduces the amount of a debt upon which the payor is liable is a payment that protects the payor's interests. *Id.*  As there is no dispute that BA was liable on the note to Datacom, any payment made essentially protected its interests.

### 2.    Subrogee Not Acting As a Volunteer

The law related to the "non-volunteer" element of subrogation has recently been stated as follows:

> Under California law, a party is considered a volunteer if, in making a payment, it has no interest of its own to protect, it acts without any obligation, legal or moral, and it acts without being requested to do so by the person liable on the original obligation.

*Morgan Creek*, 153 Cal. App. 4th at 691 n.11, 63 Cal. Rptr. 3d at 244 n.11 (citing *Hamada*, 291 F.3d at 651).

As stated above, Grantham and Saba (as successors to BA) were not strangers to the transaction.  Indeed Datacom foreclosed upon the Nevada Property to reduce a debt that BA owed directly, as a maker of a note, to BA.  Case No. 03-19478, Docket No. 397 (Mar. 10, 2005).  As such, they were not volunteers within the meaning of the *Caito* test.

### 3.    Subrogee Not Primarily Liable on the Debt Paid

The third requirement of subrogation – that "[t]he debt paid must be one for which the subrogee was not primarily liable" – is the critical element in this case.  *Golden Eagle*, 26 Cal. App. 4th at 169, 31 Cal. Rptr. 2d at 821 (quoting *Caito*, 20 Cal. 3d at 704, 576 P.2d at 470, 144 Cal. Rptr. at 756).  Its centrality derives from the basic fact that a party cannot subrogate to its own debt.  The equitable orientation of the doctrine finds no injustice or unjust enrichment in a party paying its own obligations.

California law has focused on this element in several common situations.  One is a general partner's paying of a partnership debt; since the partner is liable on the debt as matter of law, the payment does not subrogate the general partner to the status of a partnership creditor.  *Massetti*,

95 B.R. at 366 n.8; *Flick*, 75 B.R. at 206.[24] *Cf.* Mason v. Pa. Dept. of Revenue (*In re* Davis), 145 B.R. 499 (Bankr. W.D. Pa. 1992) (under 11 U.S.C. §509; finding copartners who paid partnership taxes were not entitled to a subrogated claim based on payment of taxes); Ridge v. Smothers (*In re* Smothers), 60 B.R. 733 (Bankr. W.D. Ky. 1986)(under 11 U.S.C. §509; finding debtor's partner did not become subrogee of IRS upon paying partnership taxes);  Patterson v. Yeargin (*In re* Yeargin), 116 B.R. 621 (Bankr. M.D. Tenn. 1990) (under 11 U.S.C. §509; no subrogation to IRS when corporate officer paid a 100% tax penalty for failure to pay corporate taxes).

Similarly, courts have found that the payment by a bank on a letter of credit does not subrogate the bank to the beneficiary's position; under the law applicable to letters of credit, the bank's obligation is separate, independent and primary, and thus the payment of the letter of credit satisfies the bank's primary and independent obligation under the letter of credit. *Morgan Creek*,153 Cal. App. 4th at 691 n.11, 63 Cal. Rptr. 3d at 244 n.11 (citing *Hamada*, 291 F.3d at 651).  Along the same lines, courts have found that when a codefendant in litigation pays the full amount of a judgment upon which the codefendant was jointly and severally liable, the payor does not subrogate into the position of the judgment creditor; as each of the codefendants were jointly and severally liable on the judgment, the debt was fully each of the defendants.  Fibreboard Corp. v. Celotex Corp. (*In re* Celotex Corp.), 472 F.3d 1318, 1321 (11th Cir. 2006).

Finally, California law holds that a payment by a cotenant of an obligation secured by a lien on the entire property does not subrogate the paying cotenant to the creditor's position against the other cotenant; when the obligation and security is indivisible, the payment instead satisfies pro rata the cotenant's primary obligation. *Caito*, 20 Cal. 3d at 704, 576 P.2d at 471, 144 Cal. Rptr. at 756.

Grantham and Saba, however, assert that *Caito* actually supports their position.  They contend that *Caito* establishes that a co-obligor is not primarily liable and may have subrogation rights against a third party that took for value with notice.  Grantham and Saba state categorically that Emerald Gate knew the purpose of the loan, that it  was for the sole benefit of Flamingo 55, and that BA was merely an accommodation party.  Unfortunately their argument is to no avail, because, as discussed above:  BA does not qualify as an accommodation party; Flamingo 55 was not the sole beneficiary of the loan; and the record is devoid of any evidentiary support for their contention that Emerald Gate was aware of BA's alleged status as an accommodation party. Moreover, while their arguments may have relevance with respect to the fifth element of subrogation – the balancing of the equities – as to Emerald Gate, they are irrelevant as to the Trustee's position.  Accordingly, the court rejects these arguments.

As outlined above, BA and the other Phelan-controlled entities entered into an arrangement akin to a partnership or joint venture to enable Flamingo 55 to acquire the Nevada Property. Although the details of how the profits of such venture were to be allocated is not in the record, the undeniable conclusion is that BA was a principal in the venture, and its contribution was making available its equity in the California Property to Datacom.  The payment of the debt to Datacom was thus its principal obligation, shared as it was with Flamingo 55 and other Phelan-controlled entities.  That the obligation was shared may have lead to an unsecured contribution

---

[24]In a related context, California courts recognize that partners in a partnership are direct obligors of partnership debts, and thus attempts to secure guaranties from them that waive California anti-deficiency provisions are void as against public policy.  *See, e.g.*, River Bank Am. v. Diller, 38 Cal. App. 4th 1400, 1423-24, 45 Cal. Rptr. 2d 790, 803 (Ct. App. 1995).

claim, but it does not lead to subrogation to the Datacom's secured position; allocation among equity investors does not necessarily have to mirror priorities among creditors.[25]

Datacom's debt was a primary obligation of BA.  As such, subrogation is precluded.

### 4.    Subrogee Paid the Entire Debt

To subrogate to Datacom's claim, the entire amount of the Datacom claim had to be paid. Grantham and Saba did not file their revised proof of claim until after the foreclosure proceeds had fully satisfied Datacom's debt.  As such, this element of subrogation has been met.

### 5.    Subrogation Would Not Work An Injustice to the Rights of Others or Subrogee Has "Superior Equities"

Under California law, one last step remains to be taken before a party may subrogate.  The proposed subrogation must not work an injustice to the rights of others; or the proposed subrogee must have "superior equities."  *Caito*, 20 Cal. 3d at 704, 576 P.2d at 471, 144 Cal. Rptr. at 756; *Am. Contractors*, 115 Cal. App. 4th at 1268, 9 Cal. Rptr. at 840.  This doctrine works from at least two perspectives: from the perspective of what the person seeking subrogation could have done differently; and from the perspective of how subrogation will adversely affect other interests.  Each is examined below.

### a.    The Relative Fault of the Person Seeking Subrogation

The doctrine of superior equities was confirmed as part of California law almost 70 years ago in Meyers v. Bank of America, 11 Cal. 2d 92, 77 P.2d 1084 (1938).  *Meyers'* holding has been more recently stated as follows:

> [The California] Supreme Court, following the rule in the majority of jurisdictions, adopted the principle that where a wrongdoer causes loss both to a surety by reason of its bond and to a third person, the surety's normal right of recovery through subrogation against the third person is limited to situations in which the surety's equity is superior to that of the third person.

Cont'l Ins. Co. v. Morgan, Olmstead, Kennedy & Gardner, Inc., 83 Cal. App. 3d 593, 602, 148 Cal. Rptr. 57, 62 (Ct. App. 1978).

In *Meyers*, a surety paid on a fidelity bond due to the fraudulent endorsements of its insured's employee; that employee had taken checks payable to the insured, forged the insured's endorsement, and then negotiated them with a third party.  The insured's bank paid on the checks when presented.  After payment to the insured of its loss, the surety sought to be subrogated to

---

[25]The parties have focused on tracing the proceeds of the Datacom loan in order to determine  whether BA was primarily obligated on the loan.  The unstated premise of this argument is that BA could only benefit on a dollar for dollar basis with the proceeds received.  This is a flawed premise; the benefit to BA was the anticipated profits on the investment to be made with the Phelan-controlled entities.  The benefit to BA did not change from direct to indirect as the possibilities of these profits declined.  It was primary at the outset, and the failing fortunes of Flamingo 55 did not change its character.

the insured's rights against the bank who paid the check in question over the fraudulent signature.[26] The California Supreme Court refused to allow subrogation. As stated by the court:

> In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss.

*Meyers*, 11 Cal.2d at 102-3, 77 P.2d at 1089.

Before *Meyers*, the California Supreme Court had applied similar principles to transactions, such as the one at issue in this case, which involve real property liens. In Simon Newman Co. v. Fink, 206 Cal. 143, 273 P. 565 (1928), a bank officer had made a personal loan to a farmer and had taken a security interest in the farm equipment and farm production. The defendant's employer (the bank) held a senior security interest in the same equipment and production. The debtor was unable to meet his obligations. He sought to consolidate the loans with a new loan from a third party. After reviewing the status of the loans with the bank officer, the plaintiff only agreed to fund a new loan to retire the loan to the bank and refused to pay off the unsecured loans the bank officer had extended personally. *Id.* at 145, 273 P. at 565-566.

The new lender made the loan, and then sought to be subrogated to the loan paid so as to be senior to the loan and security held by the bank officer. The court approved the subrogation, stating the applicable rule as:

> 'One who advances money to pay off an incumbrance on realty at the instance of either the owner of the property or the holder of the incumbrance, either on the express understanding, or under circumstances from which an understanding will be implied, that the advance made is to be secured by a first lien on the property, is not a mere volunteer; and in the event the new security is for any reason not a first lien on the property, the holder of such security, *if not chargeable with culpable and inexcusable neglect*, will be subrogated to the rights of the prior incumbrancer under the security held by him, *unless the superior or equal equities of others would be prejudiced thereby*, and to this end equity will set aside a cancellation of such security, and revive the same for his benefit.'

*Id.* at 146, 273 P. at 566 (quoting 27 AMERICAN & ENGLISH ENCL. OF LAW 247 (2d Ed.)) (italics added).

The principles of *Meyers* and *Fink* recently came together in Lawyers Title Ins. Corp. v. Feldsher, 42 Cal. App. 4th 41, 49 Cal. Rptr. 2d 542 (Ct. App. 1996). There, a lender lent funds to enable a borrower to pay off one of several loans against a property. The lender believed that the resulting lien would be senior to all but one loan. Through negligence, however, the lender and his title insurance company missed a lien, and the result was a priority contest. The missed lien was

---

[26]Although the Uniform Commercial Code was not in effect at the time, the same facts today would also lead to payor bank's liability to its depositor, as such check would not be properly payable. *See* U.C.C. § 4-401.

junior to the lien satisfied, but if it were given effect, would be senior to the new lender's lien. The title insurance company paid the lender, and then sued to subrogate to the paid-off lender's position.

The court denied subrogation. The trial court had found that the lender was "culpable and inexcusabl[y] neglect[ful]" as required by *Fink* in that he knew of the "missing" lien, but took no steps to ensure priority, such as either taking an assignment of the mortgage, or obtaining a subordination agreement with the lienholder on the "missing" lien. *Feldsher*, 42 Cal. App. 4th at 43, 52, 49 Cal. Rptr. 2d at 543, 549. The court had this to say about this situation:

> Greenberg [the new lender] had actual knowledge of all the facts necessary to protect his interests, and unlike the Feldshers [the holders of the "missing" lien] who were unaware of Greenberg's contemplated loan, was in a position to avoid any harm. Nevertheless, despite this knowledge Greenberg failed to take any affirmative steps to protect those interests. Greenberg's actual knowledge of the crucial facts, combined with his negligence in allowing the transaction to close despite the absence of a subordination agreement, is the type of "culpable and inexcusable neglect" which justifies denial of the doctrine of equitable subrogation under the overall circumstances of this case.

*Id.* at 53-54, 49 Cal. Rptr. 2d at 550 (citing *Fink*, 206 Cal. at 146, 273 P. at 566 and Parker v. Tout 207 (1929) Cal. 590, 592, 279 P. 431 ("bank entitled to equitable subrogation because it 'exercised every precaution to protect its rights and was not negligent or careless in releasing the first trust deed and had no notice or knowledge of the mechanic's lien when it satisfied its first lien and accepted a renewal note.'")).

As a result, "California, along with other jurisdictions, has adopted the superior equities doctrine in all cases of equitable or conventional subrogation." State Farm Gen. Ins. Co. v. Wells Fargo Bank, N.A., 143 Cal. App. 4th 1098, 1109, 49 Cal. Rptr. 3d 785, 792 (Ct. App. 2006). The burden is upon the one seeking subrogation to establish its superior equity. Am. Alliance Ins. Co. v. Capital Nat'l Bank of Sacramento, 75 Cal. App. 2d 787, 793, 171 P.2d 449, 452-453 (Ct. App. 1946).

Here, BA could have easily prevented any question of the proper characterization of its actions at the inception of the loan. It could have documented its status as a guarantor, but it did not. It could have secured Flamingo 55's obligations to it, but it did not. Rather, like the lender in *Feldsher*, it chose to do nothing in the face of the likelihood that Flamingo 55 would incur debt – and likely secured debt through a construction or other similar loan. *See* Bavely v. Huntington Nat'l Bank (*In re* Cowan), 273 B.R. 98, 107 (B.A.P. 6th Cir. 2002) (holding under Ohio law that a lender who did not explain its failure to timely note its mortgage on a certificate of title was not entitled to equitable subrogation); Equicredit Corp. v. Simms (*In re* Simms), 300 B.R. 877, 879 (Bankr. S.D. Va. 2003) (citing Ohio law for the proposition that equitable subrogation will not be used to benefit parties who were negligent in their business transactions and who were obviously in the best position to protect themselves); *In re* Am. Appliance, 272 B.R. 587, 598 (Bankr. D. N.J. 2002) (holding under Delaware law that equitable subrogation applies where a lender's new security proves defective due to fraud or some kind of mistake, but not upon grounds of poor business judgment). Having failed to protect itself, equity will not now come to its successor's rescue, especially when, as in *Meyers*, the subsequent interest holder (here, Trustee) is blameless with respect to the manner in which he acquired his interest.

18

**b.    The Effect of Imposing Subrogation on Other Parties**

The Trustee's status and lack of blame are relevant here. The principles of equitable subrogation also look to the effect of the proposed subrogation on other parties. If there will be great harm imposed upon innocent parties, such as bona fide purchasers, subrogation will not be imposed. The investigation into the effect on third parties is appropriate here; a bankruptcy trustee is a hypothetical bona fide purchaser of all of the debtor's property. 11 U.S.C. § 544(a)(3). The Trustee in this case is no different. As of his appointment, he had the status of a bona fide purchaser of the Nevada Property without notice of Grantham's and Saba's claimed subrogation interests.

California courts have held that the equities favor a bona fide purchaser over one asserting equitable subrogation. *See* J.G. Boswell Co. v. W.D. Felder & Co., 103 Cal. App. 2d 767, 230 P.2d 386, 389 (1951) (rejecting application of equitable subrogation as against bona fide purchaser); Taxel v. Chase Manhattan Bank (*In re* Deuel), 361 B.R. 509, 517 (B.A.P. 9th Cir. 2006), *citing* 58 CAL. JUR.3D, SUBROGATION § 7 (2006), text accompanying nn. 10-13 ("subrogation will not be allowed where it would work an injustice to the rights of others and does not lie against an innocent person, as where it would jeopardize or defeat intervening rights, including those of *bona fide purchasers without notice*") (emphasis added).

As *Deuel* noted, the same result has been reached under the laws of other states. Deuel, 361 B.R. at 517-18, *citing In re* Zaptocky, 250 F.3d 1020, 1028 (6th Cir. 2001) (under Ohio law, "the doctrine of equitable subrogation does not apply against a bona fide purchaser without knowledge"); In re Bridge, 18 F.3d 195, 204 (3d Cir. 1994) (trustee prevailed over creditor who was attempting to rely on its own previously released lien under equitable subrogation doctrine, applying New Jersey law).

*Deuel's* reasoning is applicable here:

> [The] Trustee's status as a bona fide purchaser is not simply a legal technicality. It serves "one of the strongest policies behind the bankruptcy laws"– the policy of ratable distribution among all creditors. *In re* Seaway Exp. Corp., 912 F.2d 1125, 1129 (9th Cir. 1990) (citation omitted) (avoiding creditor's inchoate equitable interest in real property when creditor had taken no steps to provide actual or constructive notice to subsequent bona fide purchasers). As stated in *Christie-Pequignot*, 2003 WL 22945921 at *5 [(Bankr. D. Hi. Oct., 2003), *aff'd* BAP No. HI-03-1563-KMoB (9th Cir. BAP August 11, 2004)], a creditor holding a valid and perfected lien is entitled to preferential treatment but granting such treatment to an unperfected lien "would come at the expense of other creditors and would be unjust to the other creditors."

*Id.* at 518.

If subrogation were recognized, Grantham and Saba would receive nearly the full value of the Nevada Property, and this would deprive Flamingo 55's other creditors of a pro rata share of that value. Given the confluence of California law regarding the superior equities of bona fide purchasers, and the Bankruptcy Code's policy of ratable distribution, it would be inequitable and inappropriate for Grantham and Saba, as successors to BA, to subrogate to Datacom's secured position.

19

### 6.    Summary

Of the five elements for equitable subrogation under California law, Grantham and Saba, as successors to BA, have meet only two and one-half. If their actions can constitute payment, they did satisfy the debt in full, did take action to protect their own interests, and were not volunteers in their actions. As discussed above, however, their actions did not constitute a payment of the debt, their actions were not with respect to a debt upon which BA was secondarily liable, and BA's initial failure to take simple precautions means that the Trustee has a superior equity. As all five elements must be met to make out a claim for subrogation, Grantham and Saba have failed to make their case for subrogation to Datacom's claims under California common law.

## V.   SUBROGATION UNDER 11 U.S.C. § 509(a)

Grantham and Saba contend that even if they are denied subrogation under nonbankruptcy common law and equitable principles, they still may be subrogated to Datacom's claim under Section 509 of the Bankruptcy Code. The relevant provisions of Section 509 provide:

### § 509  Claims of codebtors

(a)  Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

(b)  Such entity is not subrogated to the rights of such creditor to the extent that--

* * *

(2)  as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.

This contention is explored below.

### A.    Relation to Nonstatutory Common Law and to the U.C.C.

Courts are split as to whether Section 509 preempts or supplements the common law of subrogation, or the principles in Article 3 of the U.C.C. related to accommodation parties. As noted by Celotex Corp. v. Allstate Ins. Co. (*In re* Celotex Corp.), 289 B.R. 460 (Bankr. M.D. Fla. 2003), "the debate goes on whether § 509 preempts any other form of subrogation theory, or whether equitable subrogation criteria are the test under § 509, or whether equitable subordination is an alternative method to § 509." *Id.* at 469. *See also In re* Fiesole Trading Corp., 315 B.R. 198, 203-04 (Bankr. D. Mass. 2004); 4 COLLIER ON BANKRUPTCY ¶ 509.08 (15th rev. ed. 2007). In this case, however, this court need not decide the proper relationship between Section 509 and nonbankruptcy common law, since Grantham and Saba fail both tests.

### B.    Basic Requirements

Under Section 509, creditors such as Grantham and Saba have to show the following to be subrogated to a claim: (1) that they are an "[e]ntity that is liable with the debtor on, or that has secured . . . a claim of a creditor against a debtor . . ."; (2) that they had paid the claim secured; and (3) that they have not "received the consideration for the claim held by such creditor." *See Fibreboard Corp.*, 472 F.3d at 1321. *In re Fiesole Trading Corp.*, 315 B.R. at 203.

### 1.    "Entity that . . . has secured . . . a claim of a creditor against a debtor . . ."

Grantham and Saba seek to show how BA's signing the note to Datacom with Flamingo 55, and BA's deed of trust on the California Property, makes them an entity that "has secured . . . a claim of a creditor against a debtor." To the extent that Flamingo 55 was a co-maker with BA, it initially might appear that BA was "liable with the debtor."

But that analysis terminates the reading of the statute too soon. The full requirement is that the "entity . . . is liable with the debtor on . . . a claim of a creditor *against a debtor*." The italicized language at the end of Section 509(a) makes apparent what Section 509(b)(2) makes clear: that Section 509 effects subrogation only when nonbankruptcy law distinguishes between primary and secondary liability. This can be seen from the common situation of a guaranty: there is but one debt, and the guarantor is liable with debtor on that creditor's claim. Here, however, BA was directly liable itself on the debt to Datacom, thus creating two debts: one from BA to Datacom, and the other from Flamingo 55 to Datacom.[27] Its liability to Datacom was joint and several, and not derivative upon claims Datacom might have against Flamingo 55. Thus, Section 509 does not apply when the liability of the person seeking subrogation is direct and of equal status with the debtor's. For that reason, Grantham's and Saba's attempt to subrogate to Datacom's claim fails.

### 2.    "Subrogated to the rights of such creditor to the extent of such payment"

This element raises the same issues as does the second element of common law nonstatutory subordination: does a foreclosure suffered by the creditor constitute a payment of the claim to which the claimant wishes to subordinate? As discussed above, such a method of satisfying Datacom's claim does not constitute a voluntary payment under equitable subordination law, and that analysis applies with equal force here. See Section IV.D.1.a. Grantham and Saba, as successors to BA, did not pay anything; the buyer at the foreclosure sale did. As such, Grantham and Saba do not met this essential requirement.

### 3.    Exception — 11 U.S.C. § 509(b)(2)

Section 509(b)(2) provides that subrogation is not warranted when the entity seeking subrogation "received the consideration for the claim held by the creditor." 11 U.S.C. § 509(b)(2). "Every court that has expressly applied § 509(b)(2) has held it excludes those who are primarily liable for the debt from subrogation because they received consideration for paying the debt." Fibreboard Corp. v. Celotex Corp. (*In re* Celotex Corp.), 472 F.3d 1318, 1321 (11th Cir. 2006) (*citing* Cornmesser v. Swope (*In re* Cornmesser's Inc.), 264 B.R. 159, 163 (Bankr. W.D. Pa. 2001); *In re* Valley Vue Joint Venture, 123 B.R. 199, 205 (Bankr. E.D. Va. 1991); Patterson v. Yeargin (*In re* Yeargin), 116 B.R. 621, 622 (Bankr. M.D. Tenn. 1990); *In re* Russell, 101 B.R. 62, 65 (Bankr.D.Ark.1989)).[28]  *See also* 124 CONG. REC. 32,398, 33,998 (1978) ("Section 509(b)(2)

---

[27]The fact that a payment on one debt would have reduced the amount owing on the other is relevant for claims of contribution and indemnity among the members of BA, but is irrelevant for puroses of subrogation affecting the claims of Flamingo 55's creditors.

[28]The Eleventh Circuit also cited with approval the following statement from Pandora Indus. Inc. v. Paramount Commc'n. Inc. (*In re* Wingspread Corp.), 145 B.R. 784, 790 (S.D.N.Y. 1992):

> [T]he relevant question in the subrogation context is not simply whether the party was directly liable, but rather whether its payment was used to satisfy *another's* obligation. The question is

reiterates the well-known rule that prevents a debtor that is ultimately liable on the debt from recovering from a surety or a co-debtor"). As a result, if Grantham and Saba were primary obligees on the Datacom note, then they "received the consideration for the claim" within the meaning of section 509(b)(2).

As decided above in Section IV.D.3, BA's liability to Datacom was direct and primary. As such, the liability of BA's successors, Grantham and Saba, is also direct and primary. Consequently, they cannot qualify for subrogation under Section 509. Put another way, to the extent that BA was a partner in a venture to develop the California Property, BA or successors as a partner or coventurer may not subrogate into claims against the partnership, since that would be akin to subrogating into a debt against oneself. *Massetti*, 95 B.R. at 366 n.8; *Flick*, 75 B.R. at 206.

## VI. CONCLUSION

As successors to the rights of BA, Grantham and Saba succeeded to the rights of a partner or coventurer in the development of Nevada Property. BA had pledged the California Property for the venture, and Flamingo 55 pledged the Nevada Property. Each were directly liable to a common creditor, Datacom. When Grantham and Saba allowed their property in California to be foreclosed and Datacom's debt to be thereby satisfied, they did not become subrogated to Datacom's position. One cannot be subrogated to a debt one directly owes.

Grantham and Saba have, as they always have, BA's legitimate interest in the equity of Flamingo 55, an interest they acquired in satisfaction of the wrongs perpetrated upon them by the other partners of BA. To allow subrogation here would allow them to essentially have their cake and to eat it as well; they would be both a secured creditor and the equity owner of the property BA invested in. As the above analysis demonstrated, that they cannot do. Their claims for subrogation are thus disallowed in full.[29]

This opinion constitutes the courts findings of fact and conclusions of law in accordance with FED. R. BANKR. P. 7052. A separate order disallowing the claim will be entered in accordance with FED. R. BANKR. P. 9021.

Copies sent to:

KELLY J. BRINKMAN kbrinkman@gooldpatterson.com

---

sometimes conceived as one of 'ultimate' liability-a question that can be answered by determining which of the liable parties received the consideration.

*Fibreboard Corp.*, 472 F.3d at 1322 (emphasis in original). *See also* Patterson v. Yeargin (*In re* Yeargin), 116 B.R. 621, 622 (Bankr. M.D. Tenn. 1990) (stating § 509(b)(2) "limits subrogation to the extent that the party asserting the right received consideration for the claim held by the creditor"); *In re* Trasks' Charolais, 84 B.R. 646, 651 (Bankr. D.S.D. 1988) ("The statute looks at which entity, principal debtor or subrogee, received the consideration giving rise to the obligation.").

[29]The Trustee and Emerald Gate also seek to equitably subordinate Grantham and Saba's claim under 11 U.S.C. § 510(c). Given the disposition of their main claim, the court does not decide this claim, although the Trustee and Emerald Gate have accumulated an impressive array of misdeeds and malfeasance that could justify such subordination.

1  TIMOTHY S CORY tim.cory@corylaw.us, NV11@ecfcbis.com

2  TIMOTHY S CORY tim.cory@psinet.com, NV11@ecfcbis.com

3  TIMOTHY S. CORY tim.cory@corylaw.us

4
   DUANE H GILLMAN dhgnotice@djplaw.com
5
6  JOHN SABA sabalaw@hotmail.com, grant.law@cox.net;john-saba@sbcglobal.net

7  MARK STERN mstern79@tampabay.rr.com

8  MICHAEL F. THOMSON mftnotice@djplaw.com

9  U.S. TRUSTEE - LV - 7 USTPRegion17.LV.ECF@usdoj.gov

10
   Gregory Grantham
11 13902 Gershon Pl
   Santa Ana, CA 92705
12
13 Jeffrey Patterson
   Goold Patterson Ales Roadhouse & Day
14 4496 S. Pecos Road
   Las Vegas, NV 89121
15
16                         # # #

17

18

19

20

21

22

23

24

25

26